Opinión de conformidad emitida por el
Juez Asociado Señor Estrella Martínez.

Habla, habla tu verdad, MAESTRO, y que no humillen tu vida y tu pre-sencia; si has demostrado ser héroe sin cetro, también demuestra que tu voz es ciencia.

—“A ti maestro”, Fidencio Escamilla Cervantes
La soga del Estado pretendía extenderse hmaestros y las maestras, servidores públicos que no cualiasta los *891 fican para los beneficios del seguro social y que se encuen-tran en condiciones laborales precarias. El Estado preten-día degradar aún más la condición del maestro y la maes-tra, en aras de no degradarse a sí mismo. En ese acto egoísta, el Estado terminó enlazado con su propia soga por las casas acreditadoras. No pudo evitar lo inevitable y mu-cho menos a costa del más humilde. Llegó la hora de que el Estado ponga la palabra en la acción y adopte las medidas más razonables y efectivas que están sobre la mesa, y re-forme lo que verdaderamente hay que reformar. De lo con-trario, el egoísmo del Estado nunca encontrará base en el Derecho.
Por considerar que la Ley Núm. 160-2013 está plagada de cambios drásticos al Sistema de Retiro de los Maestros que contravienen la Constitución de Puerto Rico, estoy conforme con la determinación adoptada por este Tribunal.
En ocasión anterior, elaboré el derecho aplicable a este tipo de actuaciones gubernamentales en detrimento de los servidores públicos de este País. Así, no vacilé en determinar la inconstitucionalidad de las actuaciones del Estado al aprobar la Ley Núm. 3-2013. Véase Opinión disidente del Juez Asociado Señor Estrella Martínez en Trinidad Hernández et al. v. ELA et al., 188 DPR 828, 898 (2013). Los postulados allí elaborados aplican de igual forma a los maestros y maestras que forjan la educación pública en nuestra Isla. Con voluntad firme, nos reiteramos.
I
Como es de conocimiento público, el 24 de diciembre de 2013 se aprobó la Ley Núm. 160-2013 que estableció la Ley del Sistema de Retiro para Maestros del Estado Libre Aso-ciado de Puerto Rico y derogó la Ley Núm. 91-2004.
Insatisfechos con el trámite acaecido y la reforma pro-mulgada, el 8 de enero de 2014, la Asociación de Maestros de Puerto Rico, por sí y en representación de varios de sus miembros, presentó una Demanda sobre Injunction Preli- *892 minar y Permanente y Solicitud de Sentencia Declaratoria ante el Tribunal de Primera Instancia. En esta solicitó la paralización de la implantación de la Ley Núm. 160-2013 y que se declarara nula, ilegal e inconstitucional. Posterior-mente, acudió ante este Tribunal mediante la Solicitud de Certificación Intrajurisdiccional presentada el 14 de enero de 2014.
Como consecuencia, este Tribunal emitió una resolución el 14 de enero de 2014 concediendo lo solicitado y desig-nando al Hon. Ángel R. Pagán Ocasio como comisionado especial para que hiciera las determinaciones de hechos correspondientes. Luego, el 22 de enero de 2014, Educado-res/as por la Democracia, Unidad, Cambio, Militancia y Organización Sindical, Inc., por sí y en representación de sus miembros, (EDUCAMOS) presentó una Petición de Certificación en la que también solicitó que se declarara inconstitucional el estatuto y se paralizaran sus efectos. Este Tribunal consolidó los recursos.
En suma, los peticionarios sostienen que la Ley Núm. 160-2013 viola sus derechos constitucionales, en relación con el menoscabo de relaciones contractuales, sin que exista relación alguna entre las prohibiciones y las restric-ciones que se hacen y sus objetivos. Además, arguyen que la actuación del Estado no consideró alternativas menos onerosas y tampoco responde a un interés legítimo o auto-rizado por el derecho aplicable, pues, en efecto libera al Estado de la responsabilidad económica frente al Sistema de Retiro de Maestros (Sistema). A su vez, afirman que el menoscabo es permanente y que los aumentos en sus apor-taciones y la reducción de beneficios inciden ilegal e in-constitucionalmente sobre su peculio. En fin, señalan que las medidas adoptadas no guardan relación con los objeti-vos de la Ley Núm. 160-2013.
Por el contrario, el Estado alega que la grave situación fiscal por la que atraviesa el País le impide inyectar el dinero necesario para atender el déficit actuarial del Sistema. Al mismo tiempo, reclama que no atender la si- *893 tuación del Sistema conllevará la falta de fondos para pa-gar las pensiones y consecuentemente el crédito sería degradado. Acorde, indica que la Ley Núm. 160-2013 atiende la situación económica del Sistema al establecer un plan de aportaciones definidas con una pensión mínima garantizada, aumentar la edad de retiro para los futuros maestros y maestras, aumentar la aportación individual y patronal, eliminar las leyes especiales que conceden bene-ficios adicionales y fomentar una aportación uniforme y una aportación anual adicional. Todo lo anterior, a la vez que se garantizan los beneficios acumulados al permitir recibir una pensión equivalente a la anualidad producto de los beneficios acumulados al 31 de julio de 2014 más la anualidad a base del nuevo programa de aportaciones de-finidas vigente desde el 1 de agosto de 2014. Igualmente, se les reconoce la posibilidad de jubilarse al alcanzar los 55 años de edad y 30 años o más de servicio, o 60 años de edad y 5 años de servicio. Por otra parte, señala que se acogieron propuestas presentadas que no agravarían el fondo general y, aún de acogerse todas, estas resultarían insuficientes para reducir el déficit actuarial.
Luego, el 30 de enero de 2014, las partes presentaron las Estipulaciones de Hechos de las Partes de Conformidad con la Orden del Comisionado Especial y el 7 de febrero de 2014 recibimos el Informe del Comisionado Especial. En este último, se desglosan las estipulaciones realizadas, los documentos presentados en evidencia y se determinan como hechos, en lo pertinente, que: (1) desde sus comienzos el Sistema no es sustentable; (2) el Estado, administración tras administración, ha sido moroso en el financiamiento y ha ejecutado una restructuración para extender la vida del Sistema; (3) el Sistema presenta un déficit de efectivo de $334.5 millones para el 30 de junio de 2013, decreciendo anualmente hasta el 2020 cuando el déficit alcanzará los $316.8 millones para aumentar al 2023 a $363.2 millones; (4) la situación es una crítica que amerita atención inme-diata; (5) las casas acreditadoras advirtieron que para evi- *894 tar que el crédito fuera degradado era necesario hacer unas reformas al Sistema sin impactar significativamente el fondo general, y (6) la degradación a “chatarra” no fue mayor debido a las reducciones de los déficit operacionales y las reformas a los sistemas de retiro público que pueden contribuir sustancialmente a la estabilidad fiscal.
Finalmente, recibimos los alegatos de las partes en el caso de epígrafe, y luego de evaluarlos con detenimiento, la controversia quedó sometida ante esta Curia.
1 — 1 1 — 1
A. Es un principio de arraigo constitucional que [n]o se aprobarán leyes que menoscaben las obligaciones contractuales”. Const. PR, Art. II, Sec. 7, LPRA, Tomo 1, ed. 2008, pág. 296. Este principio encuentra una posición análoga en la Constitución federal donde se prohíbe a los estados la promulgación de estatutos que perjudiquen las relaciones contractuales. Const. EE. UU., Art. I, Sec. 10, LPRA, Tomo 1. Véanse, además: U.S. Trust Co. of New York v. New Jersey, 431 US 1, 14 (1977); E. Chemerinsky, Constitutional Law: Principles and Policies, 4ta ed., Sec. 8.3.1, pág. 645 (2011).
Al amparo de estas disposiciones constitucionales se promueve la estabilidad contractual que impide al Estado y a los gobiernos locales amortiguar sus obligaciones hacia una parte contratante o dificultar irrazonablemente la ejecución de un contrato. Véanse: U.S. Trust Co. of New York v. New Jersey, supra, pág. 15; 2 Rotunda and Nowak, Treatise on Constitutional Law: Substance and Procedure, Sec. 15.8(b), pág. 879 (5ta ed. 2012).
Como elaboramos en nuestra opinión disidente en Trinidad Hernández et al. v. ELA et al., supra, a fin de resolver si se constituye un menoscabo de una obligación contractual, resulta necesario determinar si la legislación promulgada tiene el efecto de perjudicar ese compromiso de forma sustancial. La razón para ello es que la protección *895 contra el menoscabo de obligaciones contractuales no es absoluta. Warner Lambert Co. v. Tribunal Superior, 101 DPR 378, 394 (1973); Home Bldg. & Loan Ass’n v. Blaisdell, 290 US 398, 428 (1934). Ahora bien, a estos efectos, debemos recordar que una vez establecidos los derechos y obligaciones de las partes, estos son vinculantes al amparo de la ley, y las partes confían en esos derechos. Véanse: General Motors Corp. v. Romein, 503 US 181, 186 (1992); Energy Reserves Group, Inc. v. Kansas Power and Light Co., 459 US 400, 411 (1983); U.S. Trust Co. of New York v. New Jersey, supra, pág. 17; Allied Structural Steel Co. v. Spannaus, 438 US 234, 244-245 (1978). Por ello, si los compromisos contraídos son afectados de forma sustancial estamos ante una posible violación a la cláusula de menoscabo contractual. City of El Paso v. Simmons, 379 US 497, 508 (1965); Home Bldg. & Loan Ass’n v. Blaisdell, supra, pág. 430.
De acuerdo con lo expresado, no se trata de que el Estado esté impedido de modificar sus obligaciones con el fin de promulgar un interés público, ya sea la consecución de la salud, el mejoramiento de la seguridad pública o el bienestar general, sino más bien de que tal modificación no sea una de naturaleza sustancial. Warner Lambert Co. v. Tribunal Superior, supra, pág. 394; Energy Reserves Group, Inc. v. Kansas Power and Light Co., supra, pág. 410; Allied Structural Steel Co. v. Spannaus, supra, págs. 240-241.
Es la función de los tribunales evaluar la actuación gu-bernamental para armonizar el interés del Estado en ejecutar su política pública con el de las partes contratantes en no sufrir un perjuicio sustancial. U.S. Trust Co. of New York v. New Jersey, supra, pág. 21. Al realizar esta tarea, los tribunales no debemos perder de perspectiva que la mera existencia de un interés público importante no siempre justificará un menoscabo contractual. Keystone Bituminous Coal Ass’n v. DeBenedictis, 480 US 470, 505 (1987).
El escrutinio aplicable dependerá de si la relación que se afectaría por la actuación gubernamental es una de na *896 turaleza privada o pública. En el primero de los casos, es decir, aquellos de naturaleza privada, los tribunales otor-garán deferencia al Estado respecto a la razonabilidad y necesidad de la legislación promulgada. Domínguez Castro et al. v. E.L.A. I, 178 DPR 1, 22—23 (2010). En estos casos, en donde se afectan los contratos privados entre las partes, el interés público protegido debe ser legítimo y significa-tivo, y que no lesione los derechos y responsabilidades de las partes contratantes de forma innecesaria o irrazonable. Energy Reserves Group, Inc. v. Kansas Power and Light Co., supra, págs. 411-412; Allied Structural Steel Co. v. Spannaus, supra, págs. 244 y 247; U.S. Trust Co. of New York v. New Jersey, supra, pág. 22; Domínguez Castro et al. v. E.L.A. I, supra, pág. 84.
No obstante, cuando la relación contractual afectada es de naturaleza pública, en el cual el Estado es una de las partes, el escrutinio de adjudicación constitucional es mucho más oneroso para el Estado. U.S. Trust Co. of New York v. New Jersey, supra, pág. 23; Domínguez Castro et al. v. E.L.A. I, supra, pág. 81. Como consecuencia, cuando eva-luamos el menoscabo contractual sobre obligaciones en las cuales el Estado es una de las partes contratantes, resulta indispensable examinar si este cedió poderes que vinculan indebidamente a las legislaturas futuras y sucesivas. U.S. Trust Co. of New York v. New Jersey, supra, pág. 23. De igual forma, no podemos soslayar el hecho de que una vez el Estado se impone una obligación, está forzado a cumplirla. Id., pág. 24. Permitir al Estado eludir su obliga-ción al amparo de su propio poder, es simple y llanamente impermisible. Ante esta realidad, se examina con mayor rigor la actuación del Gobierno que produce el menoscabo contractual. Tal acción sólo sobrevivirá cuando sea necesaria y razonable. íd., págs. 25-26. En ese análisis, el Tribunal debe estar consciente de que el Estado velará por sus propios intereses, por lo que se abandona la norma de deferencia al juicio de la Asamblea Legislativa respecto a qué presenta una medida razonable y necesaria. íd., pág. 26; *897 Keystone Bituminous Coal Ass’n v. DeBenedictis, supra, pág. 505; Energy Reserves Group, Inc. v. Kansas Power and Light Co., supra, pág. 412.
Sobre si la medida es razonable y necesaria, es importante establecer que para que esta sea razonable no puede intentar mitigar una situación prevista o intencionada por el Estado al momento de contraer su obligación contractual. U.S. Trust Co. of New York v. New Jersey, supra, pág. 31. La medida será necesaria cuando no exista una modificación menos drástica o medios alternos para alcanzar el interés articulado por el Estado. Domínguez Castro et al. v. E.L.A. I, supra, pág. 84; U.S. Trust Co. of New York v. New Jersey, supra, págs. 29—31. El análisis es equiparable a un escrutinio estricto. Chemerinsky, supra, Sec. 8.3, pág. 655. Es por ello que para validar el acto gubernamental, en estos casos, además, resulta indispensable escudriñar si la medida es temporera y dirigida a aten-der una situación pública de emergencia, social o económica en su naturaleza. Domínguez Castro et al. v. E.L.A. I, supra, pág. 85. En ausencia de estos criterios, la balanza se inclina a favor de la protección de la relación contractual menoscabada. Allied Structural Steel Co. v. Spannaus, supra, pág. 250.
B. La normativa antes reseñada aplica a los planes de retiro, máxime cuando estos han sido reconocidos por este Tribunal como un “interés propietario de naturaleza contractual protegido por la garantía constitucional contra el menoscabo de obligaciones contractuales”. Bayrón Toro v. Serra, 119 DPR 605, 607-608 (1987). Los planes de retiro, como el de autos, son contratos públicos en los que el Es-tado y el empleado están vinculados desde su otorga-miento. Id., pág. 618. Constituyen para el empleado una parte esencial del contrato de empleo y un beneficio de considerable importancia por constituir, en la mayoría de los casos, la única fuente de ingreso futuro que proveería una razonable seguridad económica. íd., págs. 616-617. Los planes de retiro erigen una obligación moral del *898 Estado. Íd., pág. 615, citando a Rivera v. Rodriguez, 93 DPR 21, 24 (1966).
Ahora bien, el Estado tiene la facultad de enmendar el plan de retiro ofrecido. A estos efectos, hemos expresado que el Sistema de retiro puede ser enmendado cuando el participante aún no se ha retirado. Asimismo, expusimos que para que estas enmiendas se sostengan deben ser razonables y con el fin de adelantar la solvencia actuarial del Sistema. Bayrón Toro v. Serra, supra, pág. 618. Por ello, adujimos que “[v] anadones en condiciones y requisitos [,] tales como años de servicio, aportaciones al fondo y edad para recibir los beneficios son esenciales para mantener al fondo en estado solvente”. Id., pág. 623. Sin embargo, ello no significa que el Estado tenga a su haber un comodín que le permita actuar a su antojo. Sus actuaciones estarán su-jetas al escrutinio estricto antes explicado. Es decir, las enmiendas deben ser necesarias y razonables para el fin público importante por el cual se promueven, lo que se traduce en que no existían medidas alternas para evitar el menoscabo y lo que se intenta mitigar no era previsto o intencionado por el Estado o solo le beneficie a este. En este análisis, no debemos relegar la norma de que las “le-yes que crean derechos al disfrute de pensiones se deben interpretar liberalmente a favor del beneficiario [,] a fin de que se cumpla el propósito reparador para las cuales fue-ron aprobadas”. (Enfasis suprimido). Calderón v. Adm. Sistemas de Retiro, 129 DPR 1020, 1034 (1992).
Esa es la norma jurídica que este Tribunal está obligado a aplicar a los hechos ante nuestra consideración. Al igual que hicimos en ocasión anterior, debemos comprender en qué consiste el Sistema de Retiro de Maestros para diluci-dar si los cambios incorporados por la Ley Núm. 160-2013 violentan la cláusula constitucional de menoscabo de obli-gaciones contractuales.
*899 III
A. El inicio del hoy conocido Sistema tiene su origen en el 1917 cuando se instituyó el Fondo de Pensiones para Maestros, en virtud de la aprobación de la Ley Núm. 62 de 5 de diciembre de 1917. Mediante esta, se creó un sistema de pensiones y anualidades para la clase magisterial. El Sistema sufrió su última alteración al aprobarse la Ley Núm. 91-2004, según enmendada, conocida como la Ley del Sistema de Retiro para Maestros del Estado Libre Aso-ciado de Puerto Rico, 18 LPRA see. 391 et seq. Esta última dispuso que los miembros del Sistema, sus dependientes y beneficiarios, disfrutarían de un pago de anualidades defi-nidas por retiro y por incapacidad, anualidades por defun-ción y otros beneficios. El Sistema se nutre de las aporta-ciones patronales e individuales de sus miembros y el rendimiento de sus activos.
El Sistema configurado por la Ley Núm. 91-2004 esta-blece que sus miembros aportarían el 9% y el Estado el 8.5% de su salario para sustentarlo.(1) Con ello, se confiere a cada miembro el derecho a una pensión vitalicia, la cual puede recibir cuando se alcanza la edad de: (1) 60 con 10 años de servicios acreditados, y tendría derecho a una pen-sión vitalicia equivalente al 1.8% de su salario promedio más alto durante cualesquiera 36 meses, es decir, de la compensación promedio por los años de servicios acredita-dos; (2) 50 con 30 años de servicio acreditable, para una pensión vitalicia de 75% de la compensación promedio; (3) menos de 50 con 30 años de servicio acreditable, para una pensión vitalicia de 65% de la compensación promedio; (4) 50 con más de 25 años pero menos de 30 años de servicio *900 acreditable, para una pensión vitalicia del 1.8% de la com-pensación promedio por los años de servicios acreditados, y (5) menos de 50 pero más de 47 años de edad con más de 25 años pero menos de 30 años de servicio, para el 95% del 1.8% de la compensación promedio por los años de servicios acreditados. Sin embargo, todo miembro activo que se reti-rara sin alcanzar 55 años de edad y sin tener acreditados 30 años de servicio debía contribuir al fondo con el 9% de su compensación promedio por 5 años. A su vez, la Ley Núm. 91-2004 reconoce beneficios por muerte antes y posterior al retiro, y beneficios por incapacidad ocupacional y no ocupacional.(2)
De esta forma, el Sistema buscó propiciar la seguridad económica de la clase magisterial al garantizar una pen-sión digna para los maestros y maestras cuando se jubilen, por lo que se favoreció que contara con la capacidad de administrar carteras de préstamos, inversiones y recursos. Además, se configuró la salvaguarda de que cualquiera de las inversiones realizadas serían llevadas a cabo con pre-visión, cuidado y razonabilidad, sin que estas fueran con fines especulativos, y con un balance entre expectativas de rendimiento y riesgo. Véase Art. 43 de la Ley Núm. 91-2004 (18 LPRA sec. 392h). Asimismo, y para conservar el referido Sistema, se dispuso que cualquier cambio en la estructura de sus beneficios debía ser sustentado con estu-dios actuariales previos donde se determine su costo y fuente de financiamiento. Véase Art. 3 de la Ley Núm. 91-2001 (18 LPRA sec. 391a).
Actualmente, el sistema de retiro cuenta con 42,707 miembros activos con un salario promedio anual de $30,275; una cantidad de 31,370 retirados con un beneficio promedio de $1,371 mensual, un total de 2,171 miembros incapacitados y cerca de 2,964 beneficiarios adicionales. Para el próximo año fiscal, el Sistema necesita *901 $736,590,722 para cumplir con los llamados beneficios básicos y aquellos aprobados por legislación especial.(3) Es decir, las aportaciones de sus miembros y del Estado, como patrono, no alcanzan para cubrir el flujo de efectivo que se requiere para atender sus obligaciones. Así, se estima que además de las aportaciones realizadas se necesitarán $331 millones para el 2014. Esta cifra alcanzaría los $363 millo-nes para el 2023. Claro está, ello no considera el rendi-miento de los activos que se calcula en un 5.95%.(4)
Con ese cuadro, se estima que el Sistema de retiro tiene un déficit actuarial de $10,251,272,526, con una solvencia de 17.9%.(5) Véase Valorización Actuarial del Sistema de Retiro de los Maestros al 30 de junio de 2012, Milliman *902 Report, págs. 19, 20, 26, Caso Núm. CT-2014-0003, Pieza 2. Un déficit actuarial se crea cuando se otorgan beneficios mayores a los activos que posee el Sistema, por lo que este incrementa al: (1) faltar aportaciones recurrentes; (2) au-mentar obligaciones por un número mayor de beneficiarios no previsto en su implementation, y (3) el rendimiento in-adecuado de sus activos.
Lejos de enfrentar y ejecutar medidas que garantizaran a los miembros del Sistema sus derechos, el Estado propi-ció el desangramiento de este y lo colocó en una posición vulnerable que hoy pretende resolver a expensas de sus perjudicados.(6) Como parte de los factores que deterioraron al Sistema, se encuentran: (1) las aportaciones insuficientes; (2) los programas de retiro temprano; (3) los cambios en la expectativa de vida de los participantes, y (4) el impacto de leyes especiales.(7) Véase Exposición de Motivos de la Ley Núm. 160-2013.
Específicamente, el Estado propició la llamada “crisis” al ignorar la necesidad de incrementar oportunamente las aportaciones, el flujo de efectivo necesario y la pobre administración. Este no estaba ajeno a la realidad que emana desde la creación del Sistema. Había sido advertido por los actuarios de tal necesidad. Incluso, se prevenía que el crecimiento de los activos del Sistema sería muy bajo mientras que el aumento de las obligaciones sería significativo. A estos efectos, cabe destacar que la tasa de *903 rendimiento de los activos bajó de un 8% a un 5.95%.(8) En efecto, el Sistema no contaba ni cuenta con las aportacio-nes adecuadas para mantener su solvencia. La razón con-siste en que el beneficio definido concebido por el Sistema no depende del monto de las aportaciones recibidas y tam-poco se ajusta a los cambios económicos o actuariales que afectaban el nivel de beneficios desde su creación.(9) Sin embargo, no es hasta el 2011 que el Estado decidió aumen-tar limitadamente su aportación patronal. Aprobó una me-dida que tan sólo incrementó la aportación patronal en 1% por cuatro años y en 1.25% para años posteriores hasta el 1 de julio de 2021.(10) Peor aún, el Estado solo realizó contribuciones por una fracción de lo requerido, lo que conllevó al Sistema utilizar sus recursos para pagar lo que el Estado debió haber financiado.(11) El Estado simplemente desatendió todas las recomendaciones para aumentar las aporta-ciones patronales. Véase Exposición de Motivos de la Ley Núm. 160-2013.
Como si lo expresado fuera insuficiente, el Estado pro-pagó programas de retiro temprano, cambios en los requi-sitos para ser acreedor a la jubilación e incluso permitió la compra de años de servicio a intereses que no cubrían el costo actuarial a ser recibido.(12) Como consecuencia, se exacerbó el problema debido a que estas ventanas reduje-ron el ingreso de efectivo al Sistema, aumentaron los des- *904 embolsos y el Estado dejó de hacer las aportaciones patro-nales de aquellos empleados que se acogieron a retiro temprano.(13) Además, el Estado empeñó su palabra en el afán desmedido de acaparar reconocimiento. De esta forma, aprobó el aumento de pensiones mínimas a ser recibidas,(14) las pensiones por incapacidad, defunción(15) y por retiro en un 3%.(16) Igualmente, y sin que existiera una fuente de financiamiento viable, otorgó mayores beneficios a los maestros y maestras al proveer para la contribución de un plan médico hasta de $100 a ser pagado del fondo general, Bono de Navidad de $600,(17) Bono de Verano de $100(18) y Bono de Medicamentos de $100.(19) El Estado en su demasía, acepta que los beneficios especiales están su-puestos a ser sufragados por el fondo general, “pero ello no ha ocurrido así”. Véase Exposición de Motivos de la Ley Núm. 160-2013, pág. 7. En efecto, dejó de financiar los be-neficios legislados, por lo cual el Sistema tuvo que recurrir a sus activos.(20) De igual forma, también desatendió el pro-blema del cambio en la expectativa de vida que aumentó desde el 1950 al presente. Como secuela, la alteración en la expectativa de vida obliga al Sistema a sufragar pensiones por más tiempo de lo concebido.
B. Todas estas actuaciones y omisiones por parte del Estado conllevaron el deterioro del Sistema. Ahora bien, en *905 un atropellado proceso, el Estado aprobó la Ley Núm. 160-2013. Al suscribir la pieza legislativa, adujo la necesidad de “actuar inmediatamente para mejorar y asegurar la sa-lud fiscal del Sistema, de modo que se cierre la brecha en-tre los activos netos y aquellos requeridos para continuar con el pago de las pensiones de nuestros actuales y futuros maestros retirados”. Exposición de Motivos de la Ley Núm. 160-2013, pág. 7. Con ello, el Estado pretende justificar su actuación al aprobar la Ley Núm. 160-2013, y, aunque acepta que esta representa un menoscabo de sus obligacio-nes contractuales en la medida que afecta adversamente las expectativas de los maestros y maestras respecto a su retiro, sostiene que no había alternativas más razonables. Véase Estipulaciones de hechos de las partes de conformi-dad con la orden del Comisionado Especial, estipulaciones números 84 y 85, Caso Núm. CT-2014-0002, Pieza 1.
Consecuentemente, nos corresponde exponer las medidas alternas que se presentaron antes de la aprobación de la Ley Núm. 160-2013, por los principales representantes de la clase magisterial, las cuales incluyen: (1) la reducción de un 10% de los gastos administrativos del Departamento de Educación y del Sistema;(21) (2) el saldo de $24 millones relacionado con la falta de aportaciones patronales de los que se acogieron a jubilación temprana; (3) el pago de las aportaciones patronales para los que se acogieron a retiro temprano; (4) la eliminación de las pensiones privilegia-das; (5) la imposición de un tope máximo de $3,500 como pensión; (6) el nombramiento de las plazas requeridas para incrementar el flujo de aportaciones que entran al Sis-tema; (7) un aumento de un por ciento en la contribución a las empresas foráneas para asignarlo al Sistema;(22) (8) la asignación de los fondos no reclamados de la Lotería Elec- *906 trónica; (9) la imposición de un cargo adicional al consumo de cigarrillos, bebidas alcohólicas y comidas rápidas; (10) la imposición de un cargo de hasta un 10% a los premios mayores de $1,000 obtenidos de juegos al azar; (11) la re-cuperación de $3,000 millones en deudas por cobrar de las contribuciones sobre ingresos y el impuesto sobre el valor y uso; (12) nutrir el Sistema con el cobro a los municipios, agencias y corporaciones públicas por lo adeudado con re-lación al servicio de electricidad y agua; (13) eliminar los contratos privados, cuyas prestaciones puedan ser realiza-das por empleados públicos; (14) el pago de las aportacio-nes que se adeudan al Sistema; (15) investigar las transac-ciones realizadas por el Sistema relacionada a la emisión de bonos.
De estas medidas, el Estado acogió favorablemente al-gunas de ellas: (1) reducir en un 10% los gastos del Departamento de Educación y del Sistema; (2) pagar $24 millo-nes por las deudas en el desembolso de aportaciones patronales por retiro temprano;(23) (3) eliminar prospecti-vamente las pensiones privilegiadas, y (4) nombrar plazas requeridas en las escuelas. Por el contrario, el Estado re-chazó el impuesto a las foráneas al expresar que podría causar la pérdida del crédito contributivo. En cuanto a los cargos por cigarrillos y bebidas alcohólicas indicó que no reducirán significativamente la cuantía que necesita el Sistema. Al evaluar las propuestas de asignar al Sistema los fondos no reclamados de la lotería y de imponer un cargo de hasta un 10% a los premios mayores de $1,000, el Estado se limitó a indicar que podrían afectar el flujo de efectivo del fondo general, y por lo tanto, agravar el déficit fiscal.
Ahora bien, para exponer en justa perspectiva las opcio-nes que tenía el Estado antes de aprobar la Ley Núm. 160-2013, nos remitimos específicamente a las piezas legislati-vas propuestas tanto por la Cámara como el Senado. Entre *907 estas medidas está el: (1) P. del S. 859 de 19 de diciembre de 2013, con el fin de redirigir la asignación del Fondo Especial para Becas de la Universidad de Puerto Rico al Sistema para disminuir el déficit actuarial, por lo que se transferirían $30 millones anuales en abonos mensuales de los ingresos netos de la Lotería Adicional; (2) P. del S. 848 de 13 de diciembre de 2013, mediante el cual se pro-pone dedicar la mitad del uno por ciento del arbitrio im-puesto por la Ley Núm. 154-2010, según enmendada, al fondo del Sistema, lo que representaría cerca de $244.5 millones anuales;(24) (3) R.C. del S. 281 de 1 de noviembre de 2013, para traspasar el premio en metálico no reclamado de la IVU Loto,(25) y el (4) P. de la C. 1355 de 22 de agosto de 2013, con el fin de aclarar que el Departamento de Educación está obligado a pagar la aportación patronal que corresponde a un empleado que se acogió a retiro temprano de forma tal que cubra el impacto actuarial que conlleva.
A su vez, el Estado tenía a su disponibilidad las propuestas presentadas para atender el Sistema de Retiro de los Empleados Públicos. A saber: (1) P. de la C. 926 de 12 de marzo de 2013, que propone eliminar la exención contribu-tiva a los espíritus destilados u otras bebidas alcohólicas, lo que redundaría en $180 millones anuales;(26) (2) el P. de la C. 868, que establecería la Ley de Juegos de Azar con el fin de transferir fondos de los ingresos brutos generados por las máquinas tragamonedas, lo cual se estima en $180 millones; (3) el P. de la C. 917, que transferiría de la Contribución Mínima Tentativa un porcentaje determinado al Sistema; se estima que esta iniciativa podría redundar en $150 millones anuales; (4) el P. de la C. 922, que procura disponer que el 1% del arbitrio a la adquisición de cierta *908 propiedad mueble y servicios se destine al Sistema; (5) el P. de la C. 997, que proponía establecería una contribución especial a las cooperativas de ahorro y crédito, subsidiarias y afiliadas para el fondo del retiro de los maestros y maes-tras; (6) el P. de la C. 1045, que provee para descontar las deudas de ciertas remesas al Sistema, lo cual resultaría en una inyección inmediata de $60,542,036; (7) el P. del S. 23, que recomendó crear la “Pega Dominical”, cuyos fondos serían destinados a reforzar las finanzas del Sistema; (8) el P. del S. 219, que planteaba enmendar la Ley de Seguro de Responsabilidad Obligatorio para Vehículos de Motor, a los fines de disponer que $4 de la prima pagada por el seguro obligatorio fuera destinada al Sistema; estimándose que existen 3,045,000 vehículos de motor, por lo que la medida podría aportar fondos en $12,180,000 anuales; (9) el P. del S. 428, con el fin de enmendar la Ley de Seguro de Respon-sabilidad Obligatorio para Vehículos de Motor para incluir 84 centavos mensuales a la prima universal inicial del se-guro de responsabilidad obligatorio y destinarla al Sistema de Retiro, la cual redundaría en $2,557,000 anuales; (10) el P. del S. 431, que establecía la cesión de un 2% del dinero retenido por toda entidad bancaria o financiera en nuestra jurisdicción, como parte del dinero en circulación de los depósitos de nómina de pensionados del Sistema y de la nómina de empleados públicos,(27) y (11) el P. del S. 474, que destinaría al Sistema el exceso de $6,500,000 de los fondos transferidos por la Asociación de Suscripción Conjunta, provenientes de la partida de Fondos Retenidos por el Asegurador Pertenecientes a Otros, luego de que estos se convierten en propiedad del Gobierno de Puerto Rico y pasen al fondo general.
Además de estas propuestas, y luego de la aprobación de la Ley Núm. 160-2013, el Gobernador, Hon. Alejandro Gar-cía Padilla, anunció su anuencia a la creación de un Co- *909 mité de Diálogo con el fin de auscultar otras posibilidades para atender el Sistema y salvaguardar el plan de retiro de la clase magisterial. Durante este proceso, la clase magisterial incluyó un sinnúmero de propuestas dirigidas a in-yectar fondos recurrentes al Sistema.(28) Entre estas, se propuso un impuesto a los premios de juego al azar y máquinas de entretenimiento para adultos,(29) un impuesto de $5 a las estadías en hoteles, la identificación de las deudas del Estado con el Sistema, cambios en la base de la deuda actuarial, moratoria para la concesión de préstamos, au-mentar a 20% el recorte de gastos administrativos del Sis-tema, la inclusión de 11,000 maestros y maestras que tra-bajan en escuelas privadas, impuesto a la entrada o salida de extranjeros no residentes,(30) y la imposición de pago de sellos, comprobantes y aranceles a las cooperativas del sector de ahorro y crédito, y al sector de seguros en sus ope-raciones notariales. Las medidas propuestas generarían unos $450 millones, con el fin de atender la insuficiencia operacional del Sistema.(31) Finalmente, las medidas fueron recogidas en un Informe Final emitido el 6 de febrero de 2014 del cual se desprende que estas podrían atender la insuficiencia operacional fiscal del Sistema.(32)
A base de lo expuesto, resulta patente que la Ley Núm. 160-2013 no constituye la única alternativa que el Estado debió considerar para atender la falta de flujo efectivo que *910 influye en el crecimiento del déficit actuarial que refleja el Sistema.
IV
Ahora bien, en el caso de autos, el Estado reconoce y estipuló que la aprobación de la Ley Núm. 160-2013 cons-tituye un menoscabo de las obligaciones contractuales, pues afecta adversamente el retiro de los participantes del Sistema. A pesar de ello, resulta imperativo resaltar algu-nas de las implicaciones que acarrearía la implantación de la Ley Núm. 160-2013. De este modo, podremos evaluar objetivamente si nos enfrentamos a la acción gubernamen-tal más razonable.
A estos efectos, destacaré los cambios que la implanta-ción de la Ley Núm. 160-2013 impone sobre los peticiona-rios, es decir, los participantes activos que actualmente pertenecen y cotizan en el Sistema. En primer lugar, la Ley Núm. 160-2013 en su Art. 3.9(c) limita y aumenta la edad de retiro a 55 con 30 años de servicio o 60 años de edad con 5 años de servicio para aquellos participantes activos que no tenga derecho a retirarse bajo la Ley Núm. 91-2004. Como consecuencia, elimina para estos empleados la opor-tunidad de retirarse a base de las diferentes escalas que establecía la Ley Núm. 91-2004, por las cuales han apor-tado, y les obliga a trabajar por mayor tiempo al esperado con el agravio de que tampoco tendrán derecho a la pen-sión que ostentaban. Ni siquiera tendrán derecho al 75% de la retribución promedio del maestro que confería la Ley Núm. 91-2004. Más aún, al examinar las declaraciones ju-radas presentadas en el caso de autos, resalta que los cam-bios introducidos por la Ley Núm. 160-2013 repercuten en una disminución de la pensión por retiro a ser recibida que oscila entre un 17 a 37%.
La razón para lo anterior consiste en que la Ley Núm. 91-2004 proveía el beneficio de una pensión vitalicia al mo-mento de acogerse al retiro que estaba establecida me- *911 diante una fórmula a base del salario promedio y años de servicios. De esta forma, el participante del Sistema tenía conocimiento de la pensión a la que sería acreedor durante aquellos momentos en los que más necesitaría. Sin embargo, el esquema diseñado por la Ley Núm. 160-2013 re-conoce este beneficio definido hasta el momento de su apro-bación más lo acumulado por las aportaciones que hagan el empleado y su rendimiento. Según este panorama, el par-ticipante desconoce cuánto realmente tendrá disponible al momento de retirarse. Ello, pues, el Art. 5.10(c) de la Ley Núm. 160-2013 dispone que la pensión acumulada será calculada al momento de retirarse con el balance acumu-lado de las aportaciones a la Cuenta de Aportaciones Defi-nidas, un factor establecido por la Junta en consulta con sus actuarios, a base de la expectativa de vida actuarial y una tasa de interés particular. Así, existen tres factores que el participante no controla. A base de ellos, la pensión para ese maestro o maestra puede disminuir con el hecho aislado de que la expectativa de vida aumente, según de-terminado por el actuario. Como consecuencia, no podrá planificar su retiro, ya que no contará con una cantidad definida a ser recibida impidiéndole una planificación ade-cuada para sus años de descanso. A lo anterior, se añade que estos empleados tampoco disfrutarán del Bono de Ve-rano ($100), un Bono de Medicamentos ($100), ni un Agui-naldo de Navidad ($600).(33) Más relevante aún es el hecho de que no son acreedores de los beneficios del seguro social ni del Medicare. Por lo tanto, carecen de las salvaguardas de beneficios complementarios que atiendan sus necesidades.
Ahora bien, con el propósito de justificar el cambio de pensión, el Estado proveyó en el Art. 4.4 de la Ley Núm. 160-2013 una cláusula que permite a aquellos que, entre el 1 de agosto de 2014 y el 30 de julio de 2016, cumplan 30 años de servicio acreditados retirarse con una pensión del *912 70% del salario promedio. No obstante, si la persona no tiene los 55 años de edad debe continuar realizando su aportación individual hasta alcanzar esa edad. Además, para poder disfrutar de esta concesión el empleado deberá retirarse antes del 31 de julio de 2014, lo que implica una merma en el ingreso mensual que tiene ese participante debido a que la pensión por retiro es menor a su salario. Estos participantes son incentivados a retirarse al 31 de julio de 2014 para poder disfrutar del Bono de Medicamen-tos, Aguinaldo de Navidad y una aportación para planes de beneficio de salud. (34)
El Estado pretende salvaguardar el cambio de fórmula al sostener que la Ley Núm. 160-2013 garantiza una pen-sión mínima de $1,625. Apoco se examine el Art. 3.11(a) de la pieza legislada destaca que esa pensión mínima no está disponible para todos los participantes. De hecho, aplica únicamente a los participantes que ingresen al Sistema a partir del 1ro de agosto de 2014 y cumplan con la edad de retiro de 62 y 5 años de servicio, y aquellos que estuvieran activos antes de esta fecha, pero que no eran elegibles para retirarse al momento de la aprobación de la Ley Núm. 160-2013 y se retiren cuando alcancen la nueva edad de retiro establecida para estos de 55 con 30 años de servicio.(35) Por lo tanto, no aplica al empleado que al momento de aprobarse la ley cumplía con los requisitos para retirarse. Así, se premia a aquellos integrantes del Sistema a partir del 1 de agosto de 2014, ya que con solo 5 años de servicio y una aportación mínima de $10,000 tienen garantizados una pensión mínima de $1,625. Sin embargo, una mayoría de los participantes activos no gozan de esta salvaguarda.
Por otra parte, la Ley Núm. 160-2013 incrementa la aportación individual de los participantes de un 9% a un 14.02% en menos de 6 años. No obstante, la aportación patronal se incrementa a partir del 2021 de 19.75% a *913 20.525%, es decir, en menos de un porciento.(36) Tal proceder, lejos de beneficiar al magisterio deteriora y margina aún más a esta clase trabajadora. Así, los maestros y maestras que acuden a las aulas de un salón de clase a impartir el pan de la enseñanza y quienes contribuyen con su propio peculio para lograr tal fin, son lesionados con la disminución de su sueldo sin contar con la protección futura de una pensión de retiro.
A su vez, la Ley Núm. 160-2013 modifica los requisitos para ser acreedor de una pensión por incapacidad al imponer en su Art. 4.6 el requisito de 5 años de servicio antes de ser acreedor de este beneficio y limitar el máximo de pen-sión a recibir a un 33% de su sueldo promedio. De esta forma, existe un cambio irrazonable a las condiciones en las que se otorgó su nombramiento.(37)
Por otra parte, la dádiva de $100 para aumentar la pen-sión mínima a los miembros retirados del Sistema en o antes del 31 de julio de 2014(38) se disminuye al absorber el impacto por la pérdida o disminución de ciertos beneficios establecidos en leyes especiales como lo son la merma del Bono de Verano y la reducción del Aguinaldo de Navidad por $400.(39) Igualmente, aunque la Ley Núm. 160-2013 dispone que aquellos participantes que cumplen con los re-quisitos para recibir una pensión de retiro al amparo de la Ley Núm. 91-2004 podrán disfrutar de esos beneficios más lo que acumulen de sus aportaciones definidas, resulta improbable que ello suceda, ya que el estatuto dispone que para estos casos las aportaciones realizadas antes del 1ro de agosto de 2014 serán las utilizadas para el pago de esas pensiones.(40)
Como si fuera poco, la Ley Núm. 160-2013 aumenta el interés a ser pagado para el reconocimiento de servicios no *914 cotizados, limita la facultad de devolver y transferir apor-taciones y modifica los beneficios por defunción.
V
Ante tales modificaciones, la clase magisterial de forma unísona reclama que la aprobación de la Ley Núm. 160-2013 menoscaba sustancial e irrazonablemente sus dere-chos con relación a su retiro. Exponen que existían alter-nativas menos onerosas que el Estado despachó sin consideración alguna. A su vez, arguyen que la aprobación de la Ley Núm. 160-2013 adolece de estudios que demues-tren los efectos reales de esta pieza legislativa.
En el caso ante nos, es un hecho estipulado que la re-forma instaurada por la Ley Núm. 160-2013 menoscaba sustancialmente las obligaciones del Estado, pues afecta adversamente las expectativas de la clase magisterial en cuanto a su retiro.
Establecida esa realidad, nuestra función exige exami-nar si la modificación realizada por la Ley Núm. 160-2013 persigue un interés importante en beneficio del bienestar general y si esa es necesaria y razonable para adelantar ese interés. Sin embargo, el hecho aislado de que exista un interés público importante no siempre justifica un menos-cabo contractual severo. Ante ello, nos corresponde evaluar si los compromisos contraídos por el Estado son afectados sustancialmente. Para esto, será determinante auscultar la verdadera razón detrás de la modificación. Debemos re-cordar que en este tipo de casos la deferencia a la actuación del Estado merma en la medida que este siempre velará por sus propios intereses. Así, la medida aprobada se sos-tendrá si es razonable y necesaria.
La disposición será razonable cuando mitiga una situa-ción imprevista o no intencionada del Estado y subsistirá de ser necesaria; es decir, cuando no exista una modifica-ción menos radical o medios alternos para adelantar el pro-pósito del Estado.
*915 A pesar de que el Estado conocía de la precaria situación que atravesaba el Sistema, no configuró medidas para ata-jar la crisis y contribuyó a su acrecentamiento. Así, conti-nuó aprobando ventanas de retiro, no aumentó la aporta-ción necesaria, no aportó la contribución anual requerida del Sistema, dejó de asignar y desembolsar los fondos para cubrir los beneficios adicionales otorgados, desatendió el cambio de expectativa de vida de los miembros del Sis-tema, e incluso no cumplió con su deber de aportar como patrono para aquellos que se acogieron a un retiro tem-prano, entre otras.
Todas estas actuaciones demuestran que el Estado no estaba ajeno a la situación del Sistema. Por el contrario, la situación era prevista por este e intencionada. El Estado conocía que la estructura aprobada para el retiro de los maestros y maestras no era sustentable. Sin embargo, se cruzó de brazos al no hacer las modificaciones necesarias y exacerbó las condiciones al actuar desmedidamente sin ha-cer las aportaciones requeridas. Por ende, el Sistema de-cayó por la “mala administración en realizar las aportacio-nes requeridas al [S]istema y obtener el rendimiento óptimo de inversiones”. Véanse: Opinión Actuarial sobre la Nueva Ley 160-2013 Sistema de Retiros de Maestros de Puerto Rico, por José M. Pérez Díaz, pág. 6, Caso Núm. CT-2014-0002, Pieza 1; Morning Star Pension Report de 20 de noviembre de 2013 en http://www.noticel.com/uploads/ gallery/documents/Commonwealth_of_Puerto_Rico_Pen sionReportl.pdf.
Por otra parte, la medida aprobada pretende sostenerse exclusivamente en el informe actuarial del Sistema al 30 de junio de 2012. Este no contiene ni está realizado con el objetivo de analizar, estudiar y presentar diferentes alter-nativas para cambiar el tipo de Sistema. El mismo se cir-cunscribe a exponer su situación fiscal contable. Siendo esto así, la aprobación de la Ley Núm. 160-2013 está ca-rente de una evaluación de los efectos deliberados o impre-vistos que conlleva. Tampoco existe un estudio actuarial *916 que sustente su viabilidad. Véanse: Moción en Torno a Prueba de Parte Peticionaria Asociación de Maestros de Puerto Rico, Apéndice XXVII, Informe Pericial de Jaime L. Del Valle Caballero, Apéndice: J.I. Alameda Lozada y A. González Martínez, Análisis de los Fundamentos Económi-cos Asociados a la Ley de Reforma del Sistema de Retiro de los Maestros de Puerto Rico de 30 de enero de 2014, págs. 3, 11-12 y 14, Caso Núm. CT-2014-0003, Parte 3; Informe Pericial del Perito Fernando J. Troncoso, Apéndice II de la Moción para Someter Informes Periciales y Declaraciones Juradas de Parte Interventora, ODAE, Caso Núm. CT-2014-0003, Pieza 2.
Sobre este particular, y a modo de ejemplo, se desconoce qué efecto tendrá el retiro en masa de maestros o maestras en virtud de la aprobación de la Ley Núm. 160-2013. En este sentido, se advierte que el retiro masivo de participan-tes del Sistema conlleva un efecto directo al aumentar la madurez del Sistema debido a que habrá más miembros inactivos que miembros activos; lo que conllevaría la re-ducción de las aportaciones que nutren al Sistema.(41) De igual forma, el efecto que esto acarrearía es un impacto inmediato a los activos del Sistema, que serían utilizados para solventar tal situación. Actuarialmente, se estima *917 que al amparo de la Ley Núm. 160-2013 de jubilarse 5,000 empleados se agotarían los activos en el 2022, de jubilarse 10,000 participantes en el 2018 y de jubilarse 15,000 en el 2016. Véase Opinión Actuarial... por José M. Pérez Díaz, supra, pág. 12. También, se ignora si las aportaciones exis-tentes son suficientes para sufragar la porción de la pen-sión atribuida a la Ley Núm. 91-2004, y si las aportaciones bajo el nuevo Sistema definido serán capaces de garantizar una pensión mínima de $1,625 a quienes les aplique.
Como bien señalan los peticionarios, no es un requisito indispensable cubrir el 100% de las obligaciones futuras de los planes de pensiones. De hecho, en los estados la media es de un 68.4%. Así, cuando se propone una cubierta razonable, es decir, de un 65% de las obligaciones del fondo, se tiene el efecto de disminuir considerablemente la amorti-zación anual requerida, ya que el déficit actuarial sería de $6.6 mil millones. Véase Informe Pericial de Jaime L. Del Valle Caballero, supra, págs. 6 y 11. No obstante, al exami-nar el estatuto aprobado es patente que este tampoco logra el fin público esbozado de evitar la erosión de los fondos del Sistema, con el fin de aminorar la brecha entre los activos netos y aquellos requeridos para continuar con el pago de las pensiones. Mucho menos asegura que el Estado no tenga que solventarlo a largo plazo. Esto queda demos-trado al determinarse que el principal efecto sería extender la cantidad de los activos del Sistema al 2038.(42) Opinión Actuarial... por José M. Pérez Díaz, supra, pág. 11. De igual forma, las medidas aprobadas para inyectar fondos al Sistema sólo redundan en un incremento recurrente anual de $54.5 millones más el aumento de las aportaciones in-dividuales, (43) lo cual es insuficiente para cubrir la deficiencia estipulada de $322 millones para el próximo año fiscal. *918 Véase Informe Pericial de Jaime L. Del Valle Caballero, supra, pág. 7. A su vez, el Estado no inyecta de inmediato" el flujo de efectivo al Sistema. Advertimos que no es hasta el año fiscal 2016-2017 que el Estado se compromete a realizar la Aportación Uniforme para la Justicia Magisterial de $30 millones.(44) Tal hecho nos parece paradójico cuando el Estado, al rechazar las opciones presentadas por los gremios magisteriales, se escudó en que éstas “son insuficientes para reducir el déficit actuarial y de flujo de efectivo que al presente aqueja al Sistema”. Exposición de Motivos de la Ley Núm. 160-2013, pág. 12.(45)
En conclusión, la medida aprobada menoscaba sustan-cialmente el contrato de los miembros activos en el Sistema sin que se haya realizado una evaluación de los be-neficios y costos socioeconómicos, de la viabilidad del nuevo Sistema propuesto, o de las medidas alternativas consideradas. Peor aún, la evaluación de las medidas incorporadas por la Ley Núm. 160-2013 proyecta un deterioro en la posición fiscal del Sistema y un desatino al interés que se pretendía alcanzar.
El análisis expresado demuestra que la actuación gu-bernamental al aprobar la Ley Núm. 160-2013 no es razo-nable, ya que no se trata sobre una situación imprevista por el Estado. Además, tampoco podemos concluir que esta es una necesaria. A base de las propias actuaciones del Estado, existen otras medidas alternas menos drásticas que pudo implementar en aras de salvaguardar el derecho de pensión de los participantes activos del Sistema.
*919 hH >
Ante el marco jurídico expuesto, resulta indiscutible que la Ley Núm. 160-2013 es inconstitucional por aprobarse sin un análisis adecuado y más importante aún por menos-cabar sustancialmente las obligaciones contractuales del Estado con los maestros y maestras en forma innecesaria e irrazonable, sin que alcance los objetivos por los cuales fue aprobada.
Acoger la pretensión del Estado equivaldría a echarle la soga al cuello al Sistema y estrangular su solvencia antes del 2020, acelerando la muerte que precisamente se pre-tendía evitar. Por lo tanto, es obligatorio concluir que la Ley Núm. 160-2013 es inconstitucional en la medida que afecta a los participantes activos del Sistema, al momento de su aprobación, y altera los beneficios otorgados a estos en virtud de la Ley Núm. 91-2004. (46) Siendo ello así, estoy conforme con la decisión emitida por una mayoría de esta Curia.

 Originalmente, la aportación patronal era de 6% en 1951 y aumentó en 1960 a un 7%; en 1961 aumentó a 7.70%, en 1962 a un 8.40% y en 1967 alcanzó la cifra de un 8.5%. Luego no hubo aumento hasta el 2011. Véase Ley Núm. 114-2011 (18 LPRA sec. 391l). Por su parte, las aportaciones originales eran de un 7% y llegaron al 9% en el 2000.

 Al crearse el Sistema, la edad de retiro era los 60 años con un mínimo de 10 años de servicio. Sin embargo, en el 1973 se creó el sistema por mérito antes expuesto.

 La contribución anual requerida (Annual Required Contribution, ARC) indica la cantidad necesaria para cubrir el costo normal del plan más una provisión para la amortización del déficit de la obligación actuarial acumulada. Desde el 1999, el Estado no ha contribuido la cantidad necesaria para cubrir este costo. Véase In-forme pericial del actuario Glenn Bowen de 27 de enero de 2014, pág. 3, en Moción en Cumplimiento de Orden de las Partes Recurridas, Caso Núm. CT-2014-0002, Pieza 2.

 El Sistema de retiro requiere una cuantía menor a la indicada en la medida que el rendimiento de los activos se mantenga en el 5.95% proyectado. Sin embargo, posterior al 2021 ese rendimiento no es esperado porque se proyecta que si no se hace cambio alguno al modelo del sistema de retiro este no contará con activos luego del 2020. Véanse: Valorización Actuarial del Sistema de Retiro de los Maestros al 30 de junio de 2012, Milliman Report, pág. 20, Caso Núm. CT-2014-0003, Pieza 2; Informe sobre la Aplicación del Pronunciamiento #25 de Contabilidad Gobierno en el Sistema de Retiro de Maestros, Ap. XXVII presentado por Asociación de Maestros de Puerto Rico, Caso Núm. CT-2014-003, Pieza 3; Exposición de Motivos de la Ley Núm. 160-2013; Informe pericial del actuario Glenn Bowen, supra, pág. 1.

 Al 30 de junio de 2004, la valorización actuarial determinó que el Sistema tenía un nivel de capitalización de 51%, en el 2007 de un 43.8%. Véase: Puerto Rico System of Annuities and Pensions for Teachers, Parissi, P.S.C., pág. 7 en http://www.cepsr.pr.gov/data/library/publ/ InfAct/VARRETM2006.pdf. Esto es cónsono con lo expuesto por Morningstar Pension Report de 20 de noviembre de 2013 recogido en la Opinión actuarial sobre la nueva Ley 160-2013 Sistema de Retiros de Maestros de Puerto Rico por José M. Pérez Díaz, pág. 9, Caso Núm. CT-2014-0002, Pieza 1, que demuestra que el plan de retiro para maestros y maestras tenía una obligación financiada de 40.8% para el 2007; 24.7 para el 2009; 23.9 para el 2010, 20.8 para el 2011 y 17.0 para el 2012. http://www.noticel.com/uploads/gallery/documents/ Commonwealth_of_Puerto_Rico_PensionReportl.pdf. Véase, además, Valorización Actuarial del Sistema de Retiro de Maestros al 30 de junio de 2007, Milliman Report, pág. 9 en http://www.cepsr.pr.gov/data/library/publ/InfAct/VARRETM2007.pdf.
En comparación con los estados, se demuestra que en el agregado los planes de pensiones tienen una solvencia de 66.4% y la fuente de financiamiento operacional es en su mayoría el fondo general. Véase Morningstar: The State of City Pension Plans 2013: A Deep Dive Into Shortfalls and Surpluses, http://global.morningstar.com/ CityPensions2013/Excerpt_StateofCityPensions2013.pdf.

 Nótese que el Estado reporta como una obligación neta por pensión al Sis-tema de Retiro de Maestros (net pension obligation) $2,462,232,000, lo que equivale a menos del 4% de la deuda relacionada al Fondo General, los municipios, corpora-ciones públicas y agencias. Véase Estado Financiero del Estado Libre Asociado de Puerto Rico al 30 de junio de 2012, págs. 35, 82, 209 y 212.

 En origen, el Estado se comprometió a sufragar estos beneficios del fondo general. Sin embargo, existe información de que el Gobierno no cumplió con tal compromiso, A estos efectos, se informa que este adeudó al Sistema de Retiro de Maestros $1.5 mil millones (2005); $5.968 mil millones (2006); $4.665 mil millones (2007); $1.340 mil millones (2008). Véase Informe preliminar de la Asociación de Maestros de Puerto Rico sobre los sistemas de retiro emitido como consecuencia de la Orden Ejecutiva OE-2010-10 de 12 de marzo de 2010. http://www.amprnet.org/ articles_fíles/documents/Informe%20Preliminar%20AMPR%20Comision%20Siste mas%20de%20Retiro%20ago%202010.pdf (última visita 4 de febrero de 2014).

 Véanse: Evaluación Económica de Posibles Fuentes de Recaudos y el Impacto de Estos sobre la Situación Económica del Sistema de Retiro de Maestros, 30 de enero de 2014, pág. 4, Apéndice XXVII de la Moción en torno a Prueba de Parte Peticionaria Asociación de Puerto Rico, Caso Núm. CT-2014-0003, Pieza 3; Informe pericial del actuario Glenn Bowen, supra, pág. 4.

 El financiamiento para este tipo de plan consiste en que las aportaciones más los ingresos derivados de estas (actuarial assets) contribuirán para los beneficios pagados y los gastos administrativos del Sistema (actuarial accrued liability). Cuando esta última es mayor que los activos actuarios, estamos ante un déficit (¡unfunded actuarial accrued liability).

 Ley Núm. 114-2011 (18 LPRA sec. 3911).

 Véase Morning Star Pension Report de 20 de noviembre de 2013 http://www.noticel.com/uploads/gallery/documents/Commonwealth_of_Puerto_Rico_Pen sionReportl.pdf.

 Ley Núm. 33-2001; Ley Núm. 358-2000; Ley Núm. 45-2000; Ley Núm. 44-2000. Véase, además, Informe pericial del actuario Glenn Bowen, supra, págs. 2-3.

 A estos efectos, la aportación patronal dejada de realizar alcanzó los $23,395,051 al 30 de septiembre de 2013. Véase Informe Positivo de la Comisión de Asuntos Laborables y Sistemas de Retiro del Servicio Público de la Cámara de Re-presentantes del 21 de octubre de 2013 con relación al P. de la C. 1335, 17ma Asam-blea Legislativa, 2da Sesión Ordinaria, pág. 4.

 Ley Núm. 38-2007.

Ley Núm. 272-2004.

 Véanse: Ley Núm. 38-2007; Ley Núm. 171-2003; Ley Núm. 39-2001; Ley Núm. 160-1999; Ley Núm. 226-1998; Ley Núm. 207-1995; Ley Núm. 62-1992.

 Véanse: Ley Núm. 144-2005; Ley Núm. 170-2003; Ley Núm. 109-1997.

 Ley Núm. 38-2001.

 Ley Núm. 162-2003.

 A modo de ejemplo, del informe actuarial al 30 de junio de 2012, se desprende que el Estado adeuda al Sistema de Retiro $58,451,038 desde el 2008 al 2013 por contribución al plan médico. Véase Valorización Actuarial del Sistema de Retiro de Maestros al 30 de junio de 2012, Milliman Report, supra, pág. 34.

 Ello equivale a un aumento de flujo de efectivo al Sistema de $54.4 millones anuales. Véase Exposición de Motivos de la Ley Núm. 160-2013; Evaluación Económica de Posibles Fuentes de Recaudos y el Impacto de Estos sobre la Situación Económica del Sistema de Retiro de Maestros, 30 de enero de 2014, supra, pág. 7.

 Se propuso un aumento de un por ciento en la contribución de estas empresas, lo que estimó un recaudo de $489 millones anuales.

 ei Estado nunca ha aceptado que adeuda esa cuantía de dinero.

 La Ley Núm. 154-2010 fue enmendada por la Ley Núm. 2-2013 que aprobó un arbitrio fijo de 4% para el periodo de 2013 al 2017.

 Para octubre de 2012, se estimó esta cantidad en $2,723,000.

 Nótese que se esgrimió como propuesta por los gremios imponer un impuesto a las bebidas alcohólicas y cigarrillos que el Estado despachó por entender que éstas no producirían recaudos significativos.

 Se refiere al dinero depositado pero no acreditado a la cuenta de su destinatario. Ese dinero devenga intereses para las entidades bancarias mientras se finaliza ese proceso.

 Incluso, se identificó que las medidas incorporadas por la Ley Núm. 160-2013 generan $95.5 millones de fondos para el Sistema.

 jj¡n este reng¡ón Se indicó que las máquinas de entretenimiento para adultos generan $1,800 millones anuales, de los cuales el 60% se distribuye a los jugadores sin que estos paguen impuestos, por lo que imponer un 10% a esta cantidad redunda en 108 millones anuales.

 Este impuesto podría allegar $20 millones anuales al Sistema.

 Véase E. Laureano, “Consenso irresoluto del Comité de Diálogo de maestros”, Noticel, 6 de febrero de 2014, en: http://www.noticel.com/noticia/155425/ consenso-irresoluto-del-eomite-de-dialogo-de-maestros.html.

 Véase Comité de Diálogo y Negociación sobre el Retiro de los Maestros, Informe Final, 6 de febrero de 2014, en: http://www.amprnet.org/articles_files/ documents/Informe%20Final%20Comite%20Dialogo%20y%20Negociacion%20SRM %20FADSRM.pdf.

 Véase Sec. 2 de la Ley Núm. 160-2013.

 Véase Art. 4.9 de la Ley Núm. 160-2013.

 Véase estipulación número 81 del Informe del Comisionado Especial, Caso Núm. CT-2014-0003, Pieza 4.

 Véase Art. 4.3(b) de la Ley Núm. 160-2013.

 Véase Art. 4.6(b) de la Ley Núm. 160-2013.

 Véase Art. 3.11(b) de la Ley Núm. 160-2013.

 Véase Art. 4.9 de la Ley Núm. 160-2013.

 Véase Art. 5.4(b) de la Ley Núm. 160-2013.

 Se estima que unos 7,000 maestros puedan optar por retirarse al convalidarse la Ley Núm. 160-2013. Nótese que el Sistema orientó a 10,000 participantes sobre los efectos de la Ley Núm. 160-2013. Véase Declaración Jurada de la Sra. Wanda G. Santiago López, supra, párr. 20, pág. 5. Conforme a la Sección VII(B) de la Valorización Actuarial del Sistema de Retiro de Maestros al 30 de junio de 2012, Milliman Report, supra, pág. 40, se refleja un censo de 1,490 maestros y maestras que cualifican para un retiro de 75% del promedio del salario más alto por tener 30 años o más de servicio y 50 años de edad; 4,339 maestros y maestras que poseen al menos 25 años y menos de 30 años de servicio con 50 años de edad, los cuales cualifican para una pensión del 1.8 de la compensación promedio por el número de años acreditables; 8 maestros con 30 años de servicio y menos de 50 años de edad; 447 maestros y maestras con al menos 25 años y menos de 30 años de servicio que tienen 47 años de edad pero no alcanzan los 50 años de edad, por lo que califican para el 95% del 1.8 de la compensación promedio por el número de años acreditables y 1,260 miembros activos con al menos 60 años de edad y 10 pero menos de 25 años de servicio. Es importante desatacar que según el referido informe actuarial 1,400 miembros activos que se retiraron después de la valorización anterior representaron $90 millones en pérdidas. íd., pág. 5. Nótese que aún de sustituirse la totalidad de las plazas vacantes, conllevará una disminución de la nómina que impacta directamente las aportaciones que ingresan al Sistema.

 Claro está, asumiendo que el estatuto no propiciará el retiro en masa de los maestros.

 De acuerdo con la Valorización Actuarial del Sistema de Retiro de los Maestros al 30 de junio de 2012, Milliman Report, supra, pág. 20, estimamos el incremento en la aportación individual en $13,382,290 ($1,338,229,000 x .01).

 De acuerdo con el Art. 7.1 de la Ley Núm. 160-2013, esta aportación incre-menta a partir del año fiscal 2018-2019 a $60 millones hasta el año fiscal 2041-2042.

 Advertimos, que las casas acreditadoras han hecho ese señalamiento de que la deuda no sufragada por pensiones se mantenía elevada. Veánse: Moody’s downgrades Puerto Rico GO and related bonds to Ba2, notched bonds to Ba3 and COFINA bonds to Baal, Baa2: outlook negative, 1 de febrero de 2014 en https://www. moodys.com/research/Moodys-downgrades-Puerto-Rico-GO-and-related-bonds-to-Ba2 — PR_292399; Fitch Ratings: Fitch Downgrades Puerto Rico GO and Released Bet Rating to ‘BB’; Outlook Negative, 11 de febrero de 2014, en http://www.businesswire.com/news/home/20140211006233/en/Fitch-Downgrades-Puerto-Rico-Related-Debt-Ratings.

 El proceso de colegiar, de ordinario, requiere llegar a un consenso en el cual algunos de los componentes del bloque mayoritario no siempre quedan plenamente satisfechos con la totalidad de los remedios conferidos en la Opinión del Tribunal. Esa situación se manifiesta, con mayor claridad, en esta coyuntura histórica en la que para proveer justicia al magisterio la Constitución de Puerto Rico requiere la cantidad mínima de cinco votos para decretar la inconstitucionalidad de la ley. Por eso, impartí mi voto de conformidad a la Opinión de este Tribunal, porque la misma desata los males principales que engendraba la Ley Núm. 160-2013. Ahora bien, la cortesía en colegiar no me impide que con valentía reitere mis expresiones vertidas en el caso de Cruz et al. v. ELA, 189 DPR 102 (2013), con relación a los beneficios legislados por leyes especiales.